1  **DAVID G. BANES, ESQ.**
   **O'Connor Berman Dotts & Banes**
2  **Second Floor, Nauru Building**
   **P.O. Box 501969**
3  **Saipan, MP96950**
   **Telephone No. (670) 234-5684**
4  **Facsimile No. (670) 234-5683**

5  **Attorneys for Plaintiff Steven Parks**

F I L E D
Clerk
District Court

AUG – 1 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

6

7  **IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN MARIANA ISLANDS**

8  **STEVEN PARKS,**                              )  **CIVIL CASE NO. 04-0013**
9                                                 )
              **Plaintiff,**                      )
10                                                )  **PLAINTIFF'S REPLY TO**
              **vs.**                             )  **DEFENDANTS' OPPOSITION TO**
11                                                )  **MOTION FOR ATTORNEY FEES**
                                                  )
12 **EDWARD CAMACHO, in his official and**        )  **Judge:  Munson, Chief Judge**
13 **personal capacity; DEPARTMENT OF**           )  **Date:    September 1, 2005**
   **PUBLIC SAFETY, ELIAS SARALU and**            )  **Time:    9:00 a.m.**
14 **DOES 1-10,**                                 )
                                                  )
15            **Defendants.**                      )

16

17         Defendants object to Plaintiff's request for fees claiming generally: 1.  the CNMI

18 Government really did not act callously; 2.  the billings contain items marked "no-charge" and

19 so the entire billings are suspect; 3. this case was a "routine" §1983 case; and 4. the results

20 obtained were limited as Plaintiff received only $3,300.00.[1]

21

22         In reply, as more fully discussed below, 1. the Government did act callously but this is

23 irrelevant; 2. Plaintiff is not seeking reimbursement for fees not charged; 3. this matter was far

24 from "routine"; and 4. not only did Plaintiff receive 100% of his objective (being sent to

25 California to receive "proper" treatment along with some "pocket money") - - an objective told

26 to the Government even **before** the suit was filed and disclosed to the Court at the very

27

---

[1]  This figure is misleading.  First, the money was mostly used to get Mr. Parks to an appropriate facility.  Secondly,
28 Mr. Parks could not receive much compensation as he would lose his eligibility for medicare/medicaid.

1

ORIGINAL

inception of this litigation - - but sending Mr. Parks to the appropriate facility probably saved his life and perhaps the Commonwealth from a resulting wrongful death suit. Certainly, the Commonwealth no linger has to provide medical and police services to Mr. Parks. Thus saving the Commonwealth much more than it spent.

Hence, Plaintiff should be reimbursed his fees for pursuing the litigation. Moreover, as Defendants did not accept Plaintiff's suggested compromised amount ($20,000.00), or even make a counter-offer, the Court should also award fees for having to make this Motion. *Thompson v. Gomez*, 45 F.3d 1365, 1366 (9th Cir. 1995)(court may award fees-on-fees).

## I

### THE GOVERNMENT REFUSED TO SEND PLAINTIFF TO AN APPROPRIATE TREATMENT FACILITY DESPITE THE RECOMMENDATION OF ITS OWN PHYSICIANS

Defendants contend they did not act callously and are "not responsible" for Plaintiff's disabilities. With this statement Defendants inadvertently prove Plaintiff's point all the more. Of course, Defendants were not "responsible" for Plaintiff's disabilities but the Government did have a duty to try to treat Mr. Parks, especially as it knew it did not have the appropriate facilities to do so, and its own doctors determined Mr. Parks should be sent off-island for treatment. However despite numerous prior suicide attempts, the Government never did - - until this lawsuit forced them to do so. And while the Government turned its back on Mr. Parks, he continued to cut himself and go untreated.

Then, after twelve (12) years of disturbing the peace incidents, and after this suit was filed, Defendants decided to prosecute Mr. Parks, throw him in jail, where he proceeded to severely mutilate himself, something Defendants should have anticipated, and then also refused to admit him into CHC's psychology ward. Well, if this is not callous, Plaintiff would hate to see what is. Worse, that Defendants still fail to see how they failed Mr. Parks - - or even had a duty to try to help him - - is distressing to say the least.

1    But more to the point, Mr. Parks' record speaks in loud volumes for itself: for twelve

2  years he was in-and-out of police custody for mutilating himself and for attempting suicide. The

3  Government admits (by way of silence) that the Commonwealth did not have the facility to

4  adequately treat him and admits Mr. Parks was indeed referred for treatment on the Mainland.

5  Trouble is the Government never did - - until this lawsuit was settled.

7          **a.    Ms. Knapp's Help Was Limited And Off-Set By Her Refusal To Let**

8              **Counsel Confer With Mr. Parks' Physicians.**

9    Next, as to the Government's contention that Ms. Knapp "told Mr. Banes exactly what to

10  do and how to do it" it is, at best, an overstatement.

12    To begin with, this is a completely irrelevant factor as to whether Mr. Parks is entitled to

13  fees or not. But even if relevant, such help was limited and was not as voluntary as Defendants

14  pretend: After preventing counsel from discussing Mr. Parks' case with his treating physicians

15  (unless Mr. Parks, who has no money, paid $200.00 in advance), Ms. Knapp did agree to meet

16  counsel but only after counsel wrote (twice) that he was going to bring her obstructionist

17  methods to the Court's attention. *See e.g.* Declaration of counsel dated August 1, 2005 and filed

18  herewith ("Second Banes Decl.") Decl. paras 4-7 and Exhibits H and J. More to the point, Mrs.

19  Knapp did NOT refer a specific facility appropriate for Mr. Parks (counsel had to do that on his

20  own)[2], but rather suggested a way that Mr. Parks could receive some pocket money without

21  losing his medicare/medicaid status and gave a long list of facilities or centers that could help.

22  For that, Mr. Parks is grateful. But to suggest Ms. Knapp told counsel "exactly what to do and

23  how to do it" is to turn "mere puffing", to use Defendants' phrase, into a typhoon.

26  [2]  By leaving out the attachments coupled with their assertion that Ms. Knapp told counsel "exactly what to do"
    Defendants create a misleading impression that Ms. Knapp suggested a specific facility or perhaps sent counsel a
27  short list. Plaintiff has included the attachments so the Court can see that Ms. Knapp's assistance, while
    appreciated, did not fell far short of telling counsel "exactly what to do and how to do it." *See* Second Banes Decl.,
28  Exhibits K and L.

## II

## PLAINTIFF'S BOOKKEEPING IS ACCURATE AND
## THERE WAS NO "UNNECESSARY WORK"

Defendants contend that Plaintiff's fees should be denied due to "inaccurate bookkeeping and unnecessary work". Neither objection is well founded.

### A.    Plaintiff Is Not Seeking Fees Or Costs For "No-Charge" Items

Defendants state there is something "wrong" with Plaintiff's billing statements and infer from this that the time records are suspect and conclude Plaintiff is trying to obtain fees for items marked "no-charge". Defendants look through glasses at Plaintiff too darkly. "No charge" means exactly that, Plaintiff is not seeking compensation for these fees or costs. Plaintiff in preparation for making the Motion for Fees marked certain items and certain fees that should be excluded from Plaintiff's request. This was counsel's way of separating fees and costs it was claiming from those he was not. To the extent there is any confusion, Plaintiff submits herewith a chart which hopefully sets out more clearly what fees and costs he is seeking. *See* Second Banes Decl., Exhibit 1.

### B.    All Work Was Necessary

Next, Defendants complain about "unnecessary work", more specifically Plaintiff serving discovery on Defendants. Defendants contend such discovery was unnecessary as Defendants always had agreed to settle. To start, Plaintiff notes that he is only seeking __ hours compensation for discovery as counsel voluntarily did not charge for about ½ of the work. But substantively, yes Defendants even before the litigation started were generally amenable to Plaintiff's proposed settlement proposal. But that is as far as it got. Defendants refused to

commit. *See e.g.* Second Banes Decl., Exhibits E and F. Defendants also refused to fully comply with Fed.R.Civ.Pro. Rule 26's requirement for the Initial Disclosures. *See e.g.* Banes Second Decl., para. 9, Exhibits B, C, D and E. So Plaintiff served discovery in order to comply with court-imposed deadlines but also in the hopes of spurring Defendants to respond to Plaintiff's proposal. Indeed, counsel gave Defendants an extension to respond. *Id.* at Exhibit H. It is noteworthy that Defendants also served discovery on Plaintiff which undercuts their argument that any discovery was unnecessary.

## III

## LODESTAR ANALYSIS

Plaintiff did not analyze his request for fees under the lodestar analysis as counsel had understood that the purpose of the settlement was to leave the issue of fees to be decided in the Court's sound discretion *i.e.* without a trial, it was understood Mr. Parks was not entitled to fees. Instead the parties agreed to let the Court decide as a sort of arbitrator in order to solve the Gordian Knot of having achieved 100% results for Mr. Parks, but nonetheless having to go to trial as the Government refused to commit to paying *any* fees. In any case, Plaintiff hereby submit this analysis:

### 1.    The Time and Labor Involved.

It is amazing that Defendants assert, without any factual or legal analysis, this was a "typical" §1983 case. It was not, nor was it "just" a §1983 case.

### a.    Plaintiff Asserted Various ADA and Negligence Claims.

To begin with, this matter was not just a §1983 case but also an action under the American with Disabilities Act ("ADA") as well as allegations of negligence. Counsel has

5

experience with filing so-called police brutality cases (which are generally straight forward after the first one). But here, this matter involved DPS' failure to prevent Mr. Parks from harming himself while in custody. Counsel had never undertaken such a case before and to counsel's best knowledge, this matter was one of first impression. Therefore, counsel had to undergo a sharp learning curve as to what the appropriate standard is (it differs from "routine" §1983 cases) and then to investigate if the claim met the standard. So counsel had to do the research necessary to establish the test for the Government's liability. Counsel also had to research the issue of whether Mr. Parks had an ADA claim and if so, could it be pursued against the Commonwealth. This issue follows recent Supreme Court and Ninth Circuit case law for which the Government had previously threatened counsel with sanctions. *See e.g.* Banes First Decl., Exhibit C.

Also, as explained more fully below, counsel was forced to spend time finding an appropriate facility for Mr. Parks and working with an emotionally and mentally disabled person for a client is far from "routine".

### 2.    The Novelty and Difficulty Of The Questions Involved.

Counsel took this case only after NMPASI and Micronesian Legal Services ("MPLS") both declined to represent Mr. Parks. Also, to the best of counsel's belief, this was the first-of-its-kind case filed in this District. Counsel also had to determine if there was a factual basis for charging the Commonwealth with actual or constructive knowledge as to 1. Mr. Parks' disability; and 2. his propensity to harm himself. Counsel also had to research and determine if Mr. Parks had a valid ADA claim for not properly allowing him the protection of police services despite his disabilities. Counsel then had to research if it is possible to sue the CNMI for an ADA claim.

6

a.    **The Government Never Committed To Settling Despite Numerous Requests To Do So.**

The Government admits Mr. Banes from the beginning suggested a proper resolution of this matter was to get Plaintiff "proper treatment" which necessarily meant getting Mr. Parks off-island (as the CNMI does not have the facilities to "properly" treat him).  The Government was open to the possibility.  But that is as far the Government's cooperation went.  The Government not refused to suggest an appropriate facility, it then refused to allow counsel to talk with Mr. Parks' treating physicians to find out what facility they would recommend.

Hence, counsel was forced into the awkward role of trying to determine an appropriate facility for Mr. Parks without the guiding hand of either CHC or Mr. Parks' attending physicians.  Next, as to pursuing discovery - - well of course discovery was necessary.  The Government never committed to any settlement; refused to cooperate in finding a treating facility and refused to pay even one-penny for attorney fees.  With the trial date fast approaching, counsel was left with no alternative but to proceed with litigation.

Also, in order to resolve this case, counsel had to try to determine a facility that was appropriate for Mr. Parks - - without the aid of the Government; CHC; or Mr. Parks' treating physicians.  Hence, the two biggest blocks of time in this case were spent in research and investigation of the claim as well as later amending the Complaint to try to counter certain defenses postured by Defendants.  The next largest block of time was spent finding an appropriate facility for Mr. Parks.  *See* Second Banes Decl., Exhibit 1.

In addition, counsel had to deal on an almost daily basis with Mr. Parks' personality.  As a person with mental and emotional disabilities, this required much skill, patience and time .[3]  If

---

[3]  Counsel did not feel it was appropriate to bill for much of his time in effect "hand-holding" Plaintiff and so that time is not recorded in counsel's time sheets.    However, the Court should be aware that even though counsel did not record much of this time, counsel estimates he meets with, talked to, or drove Mr. Parks on an almost daily basis.

Defendants honestly believe this is "routine", please let them try to deal with a large man who is paranoid, sees spies and hob-goblins everywhere, believes everyone, including counsel, is out to get him and is subject to deep depression and suicidal acts.

### 3.     The Skill Requisites To Perform The Legal Services Adequately.

As discussed above, NMPASI and MLS refused to represent Mr. Parks. Additionally while the litigation skills, once the Complaint was drafted, were "routine" but counsel had to have the negotiating skills to deal with the Government's refusal to commit to anything and to research skills in area that few lawyers passes, *i.e.* finding a medical facility that could and would properly treat Mr. Parks.

It would take no skill (or dedication) to simply have Mr. Parks shipped to California and leave him to fend for himself with the hope he may eventually end up in an appropriate facility. But counsel refused to do this. The Government refused to help except at the end and only then by providing a long list of perhaps helpful sources of information and perhaps appropriate facilities. Plaintiff still had to do the legwork to research and contact the listed facilities. Counsel would not have had to spend so much time if counsel had been allowed direct access to Mr. Parks' treating physicians or CHC had through its contacts suggested a facility.

### 4.     The Preclusion Of Other Employment By The Attorney Due To The Acceptance Of The Case.

This factor is not relevant.

### 5.     Customary Fee.

Counsel's hourly fee is customarily $240.00. Plaintiff has submitted two affidavit stating this is generally reasonable. The Government refers to Ms. Rayphand's hourly rate of $175.00 as reasonable. Mr. Parks notes that Ms. Rayphand, on behalf of NMPASI, refused to take Mr.

1    Parks' case. Nonetheless, if the Court wishes to adopt an hourly rate of $175.00 for Plaintiff's

2    primary counsel (Mr. Banes)[4], Mr. Parks will not object. Similarly, if the Court wished to

3    reduce Mr. Bozman's fees to $150.00 as he has less experience and Mr. Ouslander's and Ms.

4    Chang's fees to $125.00 and Ms. Sabangan to $100.00, that would be acceptable as well.

5

6        **6.      Whether The Fee Is Fixed Or Contingent.**

7        The fee was contingent except given the circumstances and Mr. Parks' need, Mr. Parks

8    received 100% of the damages awarded to him in the settlement. If the Court is inclined to

9    reduce counsel's hours worked, Plaintiff hopes the Court then uses a multiplier of 1.5 as to the

10    remaining fees:

11            The risk and delay involved in contingent fee arrangements have
12            long been seen as justification for the relatively large fees often
              resulting in contingency cases. It is consistent, then, to conclude, as
13            we do, that a contingent-fee arrangement may justify an upward fee
              adjustment when the record shows that an adjustment is necessary to
14            award counsel the "reasonable" fee to which he is entitled under
              §1988.
15

16    *Clark v. City of Los Angeles*, 803 F.2d 987, 991 (Ninth Circuit upheld multiplier of 1.5 as case

17    was taken on contingency and other lawyers refused to take the case).

18

19        **7.      Time Limitations.**

20        None other than those imposed by the Court's Case Management Order.

21

22        **8.      The Amount Involved and The Results Obtained.**

23        Incredibly, Defendants incongruously argue Plaintiff did not obtain any worthwhile

24    results as Plaintiff only received what Plaintiff always wanted, a ticket to California and pocket

25    money to tide him over while he sought help[5] - but yet claim counsel spent too much in fees as

26    ——————————————

27    [4]  The same rate would be appropriate for Messrs. O'Connor and Horey.

28    [5]  Defendants misleadingly argue Plaintiff only received $3,300.00 leaving out the critical point that that sum was arrived at by figuring out the price of a ticket to California, transportation and money for food and clothing.

"it was **always** agreed that the parties would try to get Plaintiff some proper treatment" (emphasis added)(Defendants' Brief at p.3). Defendants also refuse to acknowledge that this suit probably saved Mr. Parks' life and perhaps the Government from a wrongful death suit.

### a. The Proper Measure Is The Results Achieved And Not The Amount Of Damages

Defendants argue Plaintiff should receive no fees or just a nominal amount as Plaintiff only received $3,300.00. To begin with, the results obtained in §1983 cases often has little or nothing to do with the amount of compensation or damages awarded. Therefore, the amount of damages is not the proper indicator for success achieved. Instead, the principle of protecting rights, or here getting Mr. Parks access to proper Government services, are valid reasons for bringing an action under 42 USC §1983 even if there is little or no chance for the recovery of damages:

> In cases covered by §1988, the plaintiffs seek to vindicate civil and constitutional rights guaranteed to everyone. Through these suits, plaintiffs act as private attorneys general and often secure important results that benefit society as a whole. **Congress recognized that the importance of these societal benefits is frequently not reflected in the nominal or relatively small damage awards that these cases produce.** As a result, skilled attorneys were often unable or unwilling to prosecute civil rights cases despite the dramatic infringements of rights that were sometimes involved.
>
> Congress' response to this problem was to enact §1988 as an exception to the general rule that each party to a lawsuit shall bear its own attorney's fees. **The goal was to ensure a reasonable attorney's fee so that when constitutional violations occurred, competent counsel would be willing to come forward and assist the wronged parties in the vindication of their rights.**

*Clark*, 803 F.2d at 991 (emphasis added).

Similarly, Plaintiff could not get a large sum as compensation due to concerns that he might use the money irresponsibly and more importantly he might lose his Medicaid/medicare eligibility.

Moreover, awarding fees based on obtaining practical results rather than monetary damages is well recognized by the courts including the Ninth Circuit. For instance in *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986), the Ninth Circuit affirmed a district court's award of fees (including fees-on-fees) as the plaintiffs "achieved the practical result they sought" even though the suit "did not also lead to an award of damages." *See also City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 2695, 91 L.Ed. 2d 466 (1986)(award of reasonable attorney's fee under §1988 not conditioned upon an award of money damages). As noted by the Seventh Circuit Court of Appeals:

> We have repeatedly held, however, that an attorney's fee award need not be proportionate to the damage award. *See e.g., Ustrak v. Fairman*, 851 F.2d 983, 989 (7th Cir. 1988)(upholding fee award 21 times as great as damage award); *Wallace v. Mulholland*, 957 F.2d 333, 339 (7th Cir. 1992); *Eddleman v. Swithcraft, Inc.*, 927 F.2d 316, 318 (7th Cir. 1991); *Grosvenor v. Brienen*, 801 F.2d 944, 946-47 (7th Cir. 1986). This is so because the amount of an award, taken alone, does not represent the full value achieved by litigation vindicating one's civil right. *Grosvenor*, 801 F.2d at 946.
>
> ***
>
> Indeed, if a citizen is impotent to enforce his constitutional or statutory rights because of inability to obtain legal assistance given the limited prospect of monetary relief, "his day in court is denied him; the congressional [or constitutional] policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." *City of Riverside v. Rivera*, 477 U.S. 561, 575, 106 S.Ct. 2686, 2694. 91 L.Ed.2d. 466 (1986)(quoting 122 Cong.Rec. 33,313 (1976)(remarks of Sen Tunney)).

*Estate of Borst v. O'Brien*, 979 F.2d 511, 516-517 (7th Cir. 1992)(defendant argued no fees should be awarded because the plaintiff's success was only negligible, $500.00 compensatory damages; the court disagreed and upheld an award of $47,000.00 in fees as "consistent with the objective of Congress")(*Id.* at 516). *See also Gonzales v. Jillson*, 642 F.Supp 908 (D.Mass, 1986)(court awarded $30,000.00 in attorney fees even though police brutality victim only received $1,000.00 noting attorney fees award need not be mathematically proportional to the damages awarded); *Cool v. City of Yonkers*, 620 F.Supp 954, 956 (SDNY 1985)(court awarded

fees of $50,000.00 "despite the fact that the plaintiff recovered only $7,500.00 in damages");

*Bagsky v. St. Louis Board of Police Commissioners*, 783 F.Supp 1214, 1217 (ED Mo. 1992)(awarded attorney fees of $63,000.00 despite award of only nominal damages in police brutality case).

> **b.    The Lawsuit Achieved The Intended Result: Mr. Parks Is Undergoing Treatment At A Proper Facility.**

Next, the primary purpose of the $3,300.00 was to get Mr. Parks to an appropriate facility in California. Here, counsel attempted to get Mr. Parks "the proper treatment" **before even filing suit**. *See* Banes Declaration dated May 19th filed with Plaintiff's moving papers ("Banes' First Declaration") paras. 9-10. If the Government had responded to counsel, then attorney fees would not even be an issue. But the Government did not respond or attempt to resolve the issue. So Plaintiff had no choice but to file suit. Once filed, counsel again repeated the same offer: get Mr. Parks to a proper facility. While the Government was always generally acceptable to the proposal, it refused to commit. So at his first appearance before the Court, counsel repeated his suggested framework to resolve this matter (setting Mr. Parks off-island and some money to tide him over during treatment). Again the Government was generally acceptable to the proposal but refused to commit to it, and as discussed above, refused to find the appropriate facility for Mr. Parks, blocked counsel from conferring with Mr. Parks' physicians and also never committed to paying any attorney fees.

> **c.    The Government Always Had The Ability To Resolve This Matter And Stop Attorney Fees From Accruing.**

If the Government had fully accepted or attempted to seriously negotiate with Mr. Parks, attorney fees would either not be an issue at all or they would have been minimal. Nor is this an isolated incident of the Government ignoring a fire until forced to take action by proximity: in each of the previous police brutality cases filed with this Court, counsel tried to settle the matter early on before fees became a stumbling block but with one exception (Barry Lizama), counsel's

pleas were basically ignored until the trial was looming over Defendants. Each time Defendants then complained that counsel incurred too much for fees well, whose fault exactly is that?

So yet again, this case only settled weeks before trial and once again Defendants complain about Plaintiff's fees. Moreover, the Government never committed to sending Mr. Parks off-island or paying Mr. Parks any additional money or paying any attorney fees until December 2004 - - just seven weeks before trial. How then can Defendants claim they were "always" prepared to settle? Significantly, Defendants offer no letters or documents showing they were committed to settlement. Nor they submit any declaration that any delay was caused by Plaintiff dragging his feet. Indeed the written records shows the fault for the untimely settlement lies squarely with Defendants.

### d.    Mr. Parks Presented a Real Danger To Himself.

The need to find "proper treatment" for Mr. Parks became all the more acute due to the Government's disturbing decision to prosecute Mr. Parks for various disturbing-the-peace incidents only after he filed suit. It is disturbing as Mr. Parks has a long history of being arrested, but then not prosecuted for disturbing-the-peace incidents going back 12 years. So why prosecute now? No explanation is given and one cannot help but to conclude the motivation at least in part if not completely was due to Mr. Parks' pursuit of this suit. Worse, the Government's decision to incarcerate Mr. Parks was done with the knowledge he would harm himself - - yet the Government took no pro-active steps to ensure he did not. So Mr. Parks, true to form, began to mutilate himself while in custody and CHC refused to take him into its psychiatric ward! Counsel became concerned about Mr. Parks' rapidly deteriorating mental and physical health caused by being in custody and fearing criminal prosecution. Therefore getting Mr. Parks to "proper treatment" became the paramount concern, certainly much more so than pursuing the litigation just to try to resolve the issue of attorney fees. This concern in turn led to the settlement and this Motion.

**9.    Experience, Reputation and Ability of Counsel.**

The Court has some experience with counsel during the last 13 years both in Motion practice and trials. But counsel hereby files in his declaration a general statement.

**10.    The "Undesirability" Of The Case.**

As set forth in counsel's declaration, this case **was** "undesirable" - - both NMPASI and Micronesian Legal Services turned the case down. Also as explained *supra* Mr. Parks is not ideal client - - its not his fault, he's disabled. But it was difficult dealing with both him and his family.

**11.    The Nature and Length of the Professional Relationship With Mr. Parks.**

Not a factor.

**12.    Awards In Similar Cases.**

Plaintiff believes that while the cases cited by Defendants provide some guidance, the better example is *Saralu/Kaipat v. DPS.*  There, Plaintiff through settlement was awarded $20,000.00 for fees.  Plaintiff would stress however that since counsel has had to spend additional time in making the Motion as well as this Reply, counsel should be awarded $20,000.00 plus fees-on-fees for an additional 33 hours of work - - all required because Defendants refused to compromise. *See generally* Banes Decl., Exhibit 1.

**III**

**PLAINTIFF IS ENTITLED TO FEES FOR PURSUING A MOTION FOR FEES**

Plaintiff is entitled to fees for being forced to file and 1. litigate the issue of attorney fees. *Thompson v. Gomez,* 45 F.3d 1365 (9th Cir. 1995).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The fee-shifting provisions of 42 USC 1988 provide a ground upon which Plaintiff is due fees from the Government, including those additional fees incurred in attempting to secure payment of fees. Generally speaking, when the burden of payment for a cause of action shifts, the fees incurred while pursuing collection of such costs are also recoverable, and the recovery of these fees-on-fees is part and parcel of effectuating the purpose of fee-shifting statutes.[6] As stated by the Ninth Circuit:

> Recoverable attorney's fees may include fees incurred while doing
> work on the underlying merits of the action ("merit fees") as well
> as fees incurred while pursuing merit fees ("fees-on-fees")

*Thompson* 45 F.3d at 1366 citing to *Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986)). Indeed, "compensating attorneys for the time spent in fee litigation is necessary to effectuate the objectives underlying most attorney's fee statutes." *In re Nucorp Energy Inc.*, 764 F.2d 655, 660 (9th Circuit 1985)(here the Ninth Circuit reviewed various statutory fee-shifting provisions and various decisions awarding fees-on-fees and concluded that the grant of fees-on-fees was necessary to effectuate their purpose).

This whole issue of fees could have been avoided if at the beginning of the litigation the Government had put on the table what eventually it did. Plaintiff also made repeated attempts to settle the fee issue for significantly less than 100%. Not only did they refuse, Defendants never even offered a penny - - not even in their opposition do they suggest a figure that would be reasonable.

Therefore, in order to send an appropriate message to the Government, even if the Court reduces Plaintiff's fees for the actual litigation, Plaintiff requests 100% of the fees spent in pursuing this Motion.

---

[6] *See Thompson v. Gomez*, 45F.3d 1365, 1367 (9th Cir. 1995) and *Clark v. City of Los Angeles*, 803 F.2d 987, 992 (9th Cir. 1986)(both of which considered the fee-shifting provisions of 42 U.S.C. § 1988 and concluded that fees-on-fees were compensable and necessary to effectuate the legislative purpose of the statute that shifted attorney fees).

15

## CONCLUSION

Defendants neglected Mr. Parks for years. Mr. Parks' suit finally caused Defendants to do something it should have done a decade ago, get Mr. Parks to a place he could receive adequate treatment. So this lawsuit accomplished its stated goal. Without this suit, certainly Mr. Parks would not be receiving the medical care he urgently need. Perhaps he might have even taken one deep cut too many - - and be dead. So perhaps this suit saved a life, his.

Awarding reasonable fees is necessary to encourage lawyers to bring suits. Otherwise to quote Senator Tunney, rights will be trampled and left unvindicated, the Government's lapses will go without fixing and "the entire Nation, not just the individual citizen [will] suffer[]" *Estate of Borst*, 979 F.2d at 516-517.

Dated: August ⟋ , 2005.                    Respectfully submitted,

O'CONNOR BERMAN DOTTS & BANES
Attorney for Plaintiff Steven Parks

By: _____
        DAVID G. BANES