income of the individual, in States which make individuals
eligible for institutional care under a special income level, but
do not cover institutional care for the medically needy.

In all of the above instances, the trust must provide that the
State receives any funds, up to the amount of Medicaid
benefits paid on behalf of the individual, remaining in the trust
when the individual dies.

A trust will not be counted as available to the individual where
the State determines that counting the trust would work an
undue hardship.

---

# Medicaidlawfirms.com

**Legal help to protect your assets from nursing home expenses**

**HOME | ABOUT**

**INFO:** ALZHEIMER'S | DOMESTIC PARTNERS | ELDER LAW | ESTATE PLANNING | MEDICAID | MEDI-CAL | NURSING HOMES

Medicaid Lawyer Alliance

## Medicaid Eligibility
(Source: Centers for Medicare & Medicaid Services (CMS))

---

**Medicaid Info**

**Eligibility**

**Resource Limits**

**Transfer of Assets**

**Treatments of Trusts**

**Medicaid ATTORNEYS**

The following describes information about Medicaid eligibility.

States have some discretion in determining which groups their Medicaid programs will cover and the financial criteria for Medicaid eligibility. To be eligible for Federal funds, States are required to provide Medicaid coverage for most individuals who receive Federally assisted income maintenance payments, as well as for related groups not receiving cash payments. Some examples of the mandatory Medicaid eligibility groups are:

- Low income families with children, as described in Section 1931 of the Social Security Act, who meet certain of the eligibility requirements in the State's AFDC plan in effect on July 16, 1996;
- Supplemental Security Income (SSI) recipients (or in States using more restrictive criteria--aged, blind, and disabled individuals who meet criteria which are more restrictive than those of the SSI program and which were in place in the State's approved Medicaid plan as of January 1, 1972);
- infants born to Medicaid-eligible pregnant women. Medicaid eligibility must continue throughout the first year of life so long as the infant remains in the mother's household and she remains eligible, or would be eligible if she were still pregnant;
- children under age 6 and pregnant women whose family income is at or below 133 percent of the Federal poverty level. (The minimum mandatory income level for pregnant women and infants in certain States may be higher than 133 percent, if as of certain dates the State had established a higher percentage for covering those groups.) States are required to extend Medicaid eligibility until age 19 to all children born after September 30, 1983(or such earlier date as the State may choose) in families with incomes at or below the Federal poverty level. This phases in coverage, so that by the year 2002, all poor children under age 19 will be covered. Once eligibility is established, pregnant women remain eligible for Medicaid through the end of the calendar month in which the 60th day after the end of

the pregnancy falls, regardless of any change in family income. States are not required to have a resource test for these poverty level related groups. However, any resource test imposed can be no more restrictive than that of the AFDC program for infants and children and the SSI program for pregnant women;

- recipients of adoption assistance and foster care under Title IV-E of the Social Security Act;
- certain Medicare beneficiaries (described later); and
- special protected groups who may keep Medicaid for a period of time. Examples are: persons who lose SSI payments due to earnings from work or increased Social Security benefits; and families who are provided 6 to 12 months of Medicaid coverage following loss of eligibility under Section 1931 due to earnings, or 4 months of Medicaid coverage following loss of eligibility under Section 1931 due to an increase in child or spousal support.

States also have the option to provide Medicaid coverage for other "categorically needy" groups. These optional groups share characteristics of the mandatory groups, but the eligibility criteria are somewhat more liberally defined. Examples of the optional groups that States may cover as categorically needy (and for which they will receive Federal matching funds) under the Medicaid program are:

- infants up to age one and pregnant women not covered under the mandatory rules whose family income is below 185 percent of the Federal poverty level (the percentage to be set by each State);
- optional targeted low income children;
- certain aged, blind, or disabled adults who have incomes above those requiring mandatory coverage, but below the Federal poverty level;
- children under age 21 who meet income and resources requirements for AFDC, but who otherwise are not eligible for AFDC;
- institutionalized individuals with income and resources below specified limits;
- persons who would be eligible if institutionalized but are receiving care under home and community-based services waivers;
- recipients of State supplementary payments; and
- TB-infected persons who would be financially eligible for Medicaid at the SSI level (only for TB-related ambulatory services and TB drugs)
- low-income, uninsured women screened and diagnosed through a Center's for Disease Control and Prevention's Breast and Cervical Cancer Early Detection Program and determined to be in need of treatment for breast or cervical cancer.

**Medically Needy Eligibility Groups**

The option to have a "medically needy" program allows States to extend Medicaid eligibility to additional qualified persons who may have too much income to qualify under the mandatory or optional categorically needy groups. This option allows them to "spend down" to Medicaid eligibility by incurring medical and/or remedial care expenses to offset their excess income, thereby reducing it to a level below the maximum allowed by that State's Medicaid plan. States may also allow families to establish eligibility as medically needy by paying monthly premiums to the State in an amount equal to the difference between family income (reduced by unpaid expenses, if any, incurred for medical care in previous months) and the income eligibility standard.

Eligibility for the medically needy program does not have to be as extensive as the categorically needy program. However, States which elect to include the medically needy under their plans are required to include certain children under age 18 and pregnant women who, except for income and resources, would be eligible as categorically needy. They may choose to provide coverage to other medically needy persons: aged, blind, and/or disabled persons; certain relatives of children deprived of parental support and care; and certain other financially eligible children up to age 21. In 1995, there were 40 medically needy programs which provided at least some services to recipients.

**Amplification on Medicaid Eligibility**

Coverage may start retroactive to any or all of the 3 months prior to application, if the individual would have been eligible during the retroactive period. Coverage generally stops at the end of the month in which a person's circumstances change. Most States have additional "State-only" programs to provide medical assistance for specified poor persons who do not qualify for the Medicaid program. No Federal funds are provided for State-only programs.

Medicaid does not provide medical assistance for all poor persons. Even under the broadest provisions of the Federal statute (except for emergency services for certain persons), the Medicaid program does not provide health care services, even for very poor persons, unless they are in one of the groups designated above. Low income is only one test for Medicaid eligibility; assets and resources are also tested against established thresholds. As noted earlier, categorically needy persons who are eligible for Medicaid may or may not also receive cash assistance from the TANF program or from the SSI program. Medically needy persons who would be categorically eligible except for income or assets may become eligible for Medicaid solely because of excessive medical expenses.

States may use more liberal income and resources methodologies to determine Medicaid eligibility for certain AFDC-related and aged, blind, and disabled individuals under sections 1902(r)(2) and 1931 of the Social Security Act. For some groups, the more liberal income methodologies cannot result in the individual's income exceeding the limits prescribed for Federal matching.

Significant changes were made in the Medicare Catastrophic Coverage Act (MCCA) of 1988 which affected Medicaid. Although much of the MCCA was repealed, the portions affecting Medicaid remain in effect. The law also accelerated Medicaid eligibility for some nursing home patients by protecting assets for the institutionalized person's spouse at home at the time of the initial eligibility determination after institutionalization. Before an institutionalized person's monthly income is used to pay for the cost of institutional care, a minimum monthly maintenance needs allowance is deducted from the institutionalized spouse's income to bring the income of the community spouse up to a moderate level.

### Medicaid - Medicare Relationship

The Medicare program (Title XVIII of the Social Security Act) provides hospital insurance (HI), also known as Part A coverage, and supplementary medical insurance (SMI), also known as Part B coverage. Coverage for HI is automatic for persons aged 65 and older (and for certain disabled persons) who have insured status under Social Security or Railroad Retirement. Coverage for HI may be purchased by individuals who do not have insured status through the payment of monthly Part A premiums. Coverage for SMI also requires payment of monthly premiums.

Medicare beneficiaries who have low income and limited resources may receive help paying for their out-of-pocket medical expenses from their State Medicaid program. There are various benefits available to "dual eligibles" who are entitled to Medicare and are eligible for some type of Medicaid benefit.

For persons who are eligible for full Medicaid coverage, the Medicaid program supplements Medicare coverage by providing services and supplies that are available under their State's Medicaid program. Services that are covered by both programs will be paid first by Medicare and the difference by Medicaid, up to the State's payment limit. Medicaid also covers additional services (e.g., nursing facility care beyond the 100 day limit covered by Medicare, prescription drugs, eyeglasses, and hearing aids).

Limited Medicaid benefits are also available to pay for out-of-pocket Medicare cost-sharing expenses for certain other Medicare beneficiaries. The Medicaid program will assume their

Medicare payment liability if they qualify. Qualified Medicare Beneficiaries (QMBs), with resources at or below twice the standard allowed under the SSI program and income at or below 100% of the Federal poverty level (FPL), do not have to pay their monthly Medicare premiums, deductibles, and coinsurance. Specified Low-Income Medicare Beneficiaries (SLMBs), with resources at or below twice the standard allowed under the SSI program and income exceeding the QMB level, but less than 120% of the FPL, do not have to pay the monthly Medicare Part B premiums. Qualifying Individuals (QIs), who are not otherwise eligible for full Medicaid benefits and with resources at or below twice the standard allowed under the SSI program, will get help with all or a small part of their monthly Medicare Part B premiums, depending upon whether their income exceeds the SLMB level, but is less than 135% of the FPL, or their income is at least 135%, but less than 175% of the FPL.

Individuals who were receiving Medicare due to disability, but have lost entitlement to Medicare benefits because they returned to work, may purchase Part A of Medicare. If the individual has income below 200% of the FPL and resources at or below twice the standard allowed under the SSI program, and they are not otherwise eligible for Medicaid benefits, they may qualify to have Medicaid pay their monthly Medicare Part A premiums as Qualified Disabled and Working Individuals (QDWIs).



Legal help to protect your assets from
nursing home expenses

**HOME | ABOUT**

**INFO:** <u>ALZHEIMER'S</u> | <u>DOMESTIC PARTNERS</u> | <u>ELDER LAW</u> | <u>ESTATE PLANNING</u> | <u>MEDICAID</u> | <u>MEDI-CAL</u> | <u>NURSING HOMES</u>

Medicaid Lawyer
Alliance

# Medicaid Resource Limits

(Source: Centers for Medicare & Medicaid Services (CMS))

<u>**Medicaid Info**</u>

<u>**Eligibility**</u>

<u>**Resource Limits**</u>

<u>**Transfer of
Assets**</u>

<u>**Treatments of
Trusts**</u>

<u>**Medicaid
ATTORNEYS**</u>

**2004 SSI FBR, RESOURCE LIMITS, 300% CAP, BREAK-EVEN POINTS, SPOUSAL IMPOVERISHMENT STANDARDS**

**EFFECTIVE DATE:** January 1, 2004 unless otherwise noted.

**CPI INCREASE FOR 2003:** 2.1 percent

**SSI FBR**

INDIVIDUAL: 564.00
COUPLE: 846.00

**SSI RESOURCE STANDARD**

INDIVIDUAL: 2,000.00
COUPLE: 3,000.00

300 PERCENT CAP LIMIT

INDIVIDUAL: 1,692.00
COUPLE: N/A

**SSI BREAK-EVEN POINTS**

**EARNED INCOME**

INDIVIDUAL: 1,213.00
COUPLE: 1,777.00

**UNEARNED INCOME**

INDIVIDUAL: 584.00
COUPLE: 866.00

**SPOUSAL IMPOVERISHMENT STANDARDS**

CPI INCREASE SINCE SEPTEMBER 1988: 54.6 percent

MIN. CS MONTHLY INCOME ALLOWANCE: 1,515.00 (effective
7/1/03)

CS MONTHLY HOUSING ALLOWANCE: 454.50 (effective 7/1/03)

MAX. CS MONTHLY INCOME ALLOWANCE: 2,319.00

MIN. CS RESOURCE STANDARD: 18,552.00

MAX. CS RESOURCE STANDARD: 92,760.00

MAX. SPOUSAL SHARE: 92,760.00

---



**Legal help to protect your assets from
nursing home expenses**

**HOME | ABOUT**

---

**INFO: ALZHEIMER'S | DOMESTIC PARTNERS | ELDER LAW | ESTATE PLANNING | MEDICAID | MEDI-CAL |
NURSING HOMES**

---

Medicaid Lawyer
Alliance

**Medicaid Info**

**Eligibility**

**Resource Limits**

**Transfer of
Assets**

**Treatments of
Trusts**

**Medicaid
ATTORNEYS**

## Transfers of Assets

(Source: Centers for Medicare & Medicaid Services (CMS))

(Section 1917(c) of the Social Security Act; U.S. Code
Reference 42 U.S.C.1396p(c))

Under the transfer of assets provisions, States must withhold
payment for various long- term care services for individuals
who dispose of assets for less than fair market value. The term
"assets" includes both resources and income.

These provisions apply when assets are transferred by
individuals in long- term care facilities or receiving home and
community-based waiver services, or by their spouses, or
someone else acting on their behalf. At State option, these
provisions can also apply to various other eligibility groups.

States can "look back" to find transfers of assets for 36
months prior to the date the individual is institutionalized or, if
later, the date he or she applies for Medicaid. For certain
trusts, this look-back period extends to 60 months.

If a transfer of assets for less than fair market value is found,
the State must withhold payment for nursing facility care (and
certain other long term care services) for a period of time
referred to as the penalty period.

The length of the penalty period is determined by dividing the
value of the transferred asset by the average monthly private-
pay rate for nursing facility care in the State. Example: A
transferred asset worth $90,000, divided by a $3,000 average
monthly private-pay rate, results in a 30-month penalty
period. There is no limit to the length of the penalty period.

For certain types of transfers, these penalties are not applied.
The principal exceptions are:

Transfers to a spouse, or to a third party for the sole benefit of
the spouse,

Transfers by a spouse to a third party for the sole benefit of
the spouse,

Transfers to certain disabled individuals, or to trusts
established for those individuals,

---

Case 1:04-cv-00013     Document 34-3     Filed 08/01/2005     Page 10 of 25

Transfers for a purpose other than to qualify for Medicaid, and

Transfers where imposing a penalty would cause undue hardship.

---

FAXED 11 24 04

**SAIPAN OFFICE**
Second Floor, Nauru Building
P.O. Box 501969
Saipan, MP 96950-1969
Telephone: (670) 234-5684/5
Fax: (670) 234-5683
E-mail: attorneys@saipan.com

**HONOLULU OFFICE**
Suite 2800, Pacific Tower
Bishop Square, 1001 Bishop Street
Honolulu, Hawaii 96813-3580
Telephone: (808) 585-8858
Fax: (808) 599-4198
E-mail: mark@shklovlaw.com

**GUAM OFFICE**
Suite 503, Bank of Guam Bldg.
111 Chalan Santo Papa
Hagåtña, Guam 96910
Telephone: (671) 477-2778
Fax: (671) 477-4366
E-mail: bermlaw@kuentos.guam.net

**POHNPEI OFFICE**
Second Floor, Ace Commercial Building
P.O. Box 1491, Kolonia, Pohnpei,
Federated States of Micronesia, 96941
Telephone: (691) 320-2868
Fax: (691) 320-5450
E-mail: bermlaw@mail.fm

# O'CONNOR BERMAN DOTTS & BANES

## ATTORNEYS AT LAW
### *SAIPAN OFFICE*
www.pacific-lawyers.com

November 24, 2004

**Delivered by Telecopy**                        **FOR SETTLEMENT**
                                                 **DISCUSSIONS ONLY**

David W. Lochabay
Office of the Attorney General
Caller Box 10007
Saipan, MP 96950
Fax No. 664-2349

Re:  *Stephen Parks v. DPS et al.*

Dear David:

  If I do not talk with you before, have an enjoyable Thanksgiving.

  I understand an agreement has been reached as to the criminal charges against Steve.  I would like to try to resolve the civil matter so Steve can perhaps be home by Christmas.

  Here is our proposal:

   a.  one-way ticket to California;
   b.  $2,000.00 settlement assigned to his mother;
   c.  $9,500.00 attorney fees (our current fees total $21,000.00) - - so this is less than 50%;
   d.  Steve agrees not to return to the CNMI for five years; if he does, the criminal charges could be reinstated and he would have to pay back the $2,000.00 and cost of the ticket;
   e.  There would be no admission of liability;
   f.  A dismissal with prejudice of all of Steve's claim.

  This proposed settlement is not intended to reflect any perception as to the merits vel non.  Instead, it is offered to try to get Steve the medical care he desperately needs as soon as possible.  Therefore, any discussion as to merits is probably not necessary.  But let me take a moment just to point out that this lawsuit certainly put DPS on notice that



Steve presents a danger to himself.[1]  Yet Steve was able to repeatedly injure himself including the most recent incident a week or so ago with a razor blade.  This strongly suggests, at the least, that DPS does not have the proper procedure in place for arresting, searching and holding in custody disabled persons such as Steve and there is a persistent lack of training as to how to handle persons like Steve while they are in custody.

I am sure DPS has a response to this.  But at the very least these facts present a matter requiring trial and Steve may have multiple claims given his subsequent episodes (but the settlement would of course resolve everything).  If this matter proceeded to trial, the attorney fees would be significantly higher and there is the risk (for both sides) that Mr. Parks may be detained again and this time really harm himself perhaps even to the point of grievous bodily harm or even death.  Also, our offer we believe is extremely reasonable and is intended to foster a quick resolution of this matter so Steve could get medical help.  It does not reflect our view of the merits of the claim.

Please let me know if this is acceptable.  Thank you.

Truly yours,

David G. Banes

3083-01-041123-LTR-DLochabay-rcr

---

[1] We believe DPS knew this before the suit was filed anyway.  From the earlier police reports, it is apparent that DPS including arresting officer knew Steve.

3083-01-041123-LTR-DLochabay-rcr



Commonwealth of the Northern Mariana Islands
# Office of the Attorney General
2nd Floor Hon. Juan A. Sablan Memorial Bldg.
Caller Box 10007, Capitol Hill
Saipan, MP 96950

**Civil Division**
Tel: (670) 664-2341/2342
Fax: (670) 664-2349

**Immigration Division**
Tel: (670) 236-0922/0923
Fax: (670) 664-3190

**Criminal Division**
Tel: (670) 664- 2366/2367/2368
Fax: (670) 234-7016

December 16, 2004

Re: Parks v. CNMI

**VIA FAX TO 234-5683**

David Banes, Esq.
O'Connor Berman Dotts & Banes
Nauru Bldg.
Saipan, MP 96950

Dear David:

Thank you for your letter of November 24, 2004, and I apologize for not being able to respond to it earlier. As you know, we have a new DPS Director who must be brought up to speed.

I have no knowledge of the status of Mr. Parks's criminal charges and have asked the criminal division to update me.

As to the rest of your proposal, we have no problem with furnishing a one-way ticket to California and assigning $1,000 to his mother.

It goes without saying that your claimed attorney's fees are grossly excessive. A total of $21,000.00 in attorney's fees for a case in which you have only filed a Complaint and sent out some discovery materials is quite unreasonable. It is even more unreasonable in light of the fact that you have no case on the merits of the § 1983 action, and could easily be subject to an award of defendant's attorneys fees for filing a groundless action.

Like you, I do not want to get into the merits of your entire Complaint. Suffice to say, we feel like we have substantial defenses to all of the allegations and will not hesitate to present them to a jury, if your case can survive summary judgment.

You have stated to me and to Judge Munson many times that your purpose in pursuing this action is to get Mr. Parks some help. We are willing to facilitate that by getting Mr. Parks to California with some spending money as indicated above. This action will have served a useful purpose if it results in that. We are not willing to pay attorney's fees in an action in which we feel there is no liability.

$\mathcal{N}$

As to Mr. Parks being required to remain outside the Commonwealth by "agreement", there are significant constitutional problems with restricting Mr. Parks's right to travel within the United States, and we feel it is best left out of any settlement   Likewise, there are constitutional problems with any "agreement" that Mr. Parks will be prosecuted for previous offenses should he return here within a specified length of time.  It is a separate matter whether he would have to repay the CNMI for monies expended in any settlement and we would want to impose such a requirement.

I look forward to your response.

Yours very truly,

David Lochabay
Asst. Attorney General

## David Banes

| | |
|---|---|
| **From:** | "David Banes" <dbanes@saipan.com> |
| **To:** | "Angela Krueger" <krueger@nmidefender.org>; "David Hutton" <saipanlegal@hotmail.com> |
| **Sent:** | Friday, November 19, 2004 11:51 AM |
| **Subject:** | Re: Stephen Parks-The Saga continues |

David,

Thanks very much for agreeing to lookinto this case personally as I now you are very busy.

For what it is worth, Judge Munson said in effect he would like the civil case wrapped up by Christmas and we cannot resolve the civil case w/o resolving the criminal case.

Also Steve may be a "frequent flyer" but lately each one of those "flights" have resulted in him cutting himself - - badly. Also he presents more of a danger to himself than others - - this is not some thug who enjoys beating up people. Instead he is a person with deep mental and emotional problems which unfortunately no one here on Saipan is qualified to treat (and CHC readily admits this due to lack of medicare funding). So is he a frequent flyer b/c he's a bad guy or b/c he's not getting the help he needs?

Also I believe DPS' knowledge of the danger he presents to himself is very well established - - and yet he still does manages to hurt himself badly. So potentially there are now multiple claims he may have against the Government. I dont think it is in Steve's best interest to try to litigate any of those incidents. But if he is looking at jail time, well why not?

The point is not to argue the merits but rather to stress that it is not in anybody's best interest (including the CNMI's) to have this guy around anymore and certainly not to put him back into custody where he may actually succeed in killing himself.

If I can be of any help, please feel free to contact me.

Cheers,

Dave

----- Original Message -----
**From:** Angela Krueger
**To:** David Hutton
**Cc:** David Banes
**Sent:** Friday, November 19, 2004 10:48 AM
**Subject:** Re: Stephen Parks-The Saga continues

David:

I have attached a copy of my proposed plea agreement. (I will forward a hardcopy to your office.) The terms I propose are generally that Mr. Parks will plead guilty to Counts 1-3; that he will be sentenced to six-months' custody with credit for time served (suspended) on each count, to run consecutive; that Mr. Parks will voluntarily depart from the CNMI and will remain outside the CNMI during the term of his probation (18 months). Mr. Parks has no intent to return given the stress that being here has caused him. These terms are the same as the one I had proposed in my last email.

Alternatively, we could agree that the prosecution will dismiss the charges against Mr. Parks without prejudice. In exchange, Mr. Parks will waive any statute of limitations defense that he may have on the charges; will agree to leave the CNMI; and will agree that if he ever returns to the CNMI, the Government can reinstitute the charges against him. We could also agree that Mr. Parks will make an *admission* of guilt (not a formal plea) as to Counts 1-3 (on the record before the Court) that could be used against him were he to come back. This, I think, would give you a legally enforceable remedy should Mr. Parks ever return to the CNMI. But I seriously



11/23/2004

doubt that he wants to come back given the problems that he has had here.

What remains are the details of Mr. Parks leaving the CNMI.  Dave Banes and I are hoping to work together to arrange to have Mr. Parks go to a specific facility or doctor in California.  But the details of his departure (air ticket, etc.) are part of a civil settlement  (if one is reached), so those specific issues are out of my control.

Whether Mr. Parks has HIV doesn't matter as far as the criminal case is concerned.   (And as you do not believe that he is HIV positive, what difference does it make?)  Mr. Parks' problems relate to his mental health, with which DPS, CHC, and DOC are not equipped to deal.  Unfortunately, Mr. Parks' mental health is deteriorating rapidly.  If we don't help him to find the medical attention he needs, it will create more problems for the Commonwealth, and it could be fatal for Mr. Parks.

--Angie


----- Original Message -----
**From:** David Hutton
**To:** krueger@nmidefender.org
**Sent:** Friday, November 19, 2004 8:40 AM
**Subject:** Stephen Parks-The Saga continues

    Angela ,

    What are you proposing ? This guy is a "frequent flyer" in the criminal justice system . He also has stated that he has active HIV ( which I do not believe ) which has scared the hell out of everybody .I would like a blood screen test to determine this once and for all . Also , what are his plans after recieving treatment .Your thoughts , David


**David W. Hutton**
**Chief Prosecutor**
**Criminal Division, Office of the Attorney General**
**Commonwealth Of The Northern Mariana Islands**

11/23/2004

## David Banes

**From:** "David Banes" <dbanes@saipan.com>
**To:** "David Hutton" <saipanlegal@hotmail.com>
**Cc:** <krueger@nmidefender.org>
**Sent:** Friday, November 19, 2004 8:36 AM

Dear David,

I understand Mr. parks' proposed plea didnt happen yesterday.

I believe Mr. Parks' health situation is seriously deteriorating and everybody (including CHC) admits he cannot get here the help he desperately needs.  I know your office is very busy but can we please put this on the fast tract before he kills himself or causes further serious bodily harm.

Thanks,

Dave

Thanks,



APPENDIX

**Initial Investigation and Drafting of Complaint**        (1/27 to 5/17)

(Discussions with NMPASI and MLS; Research §1983 and
ADA standards; Meetings with client; Contact potential expert
witness; Draft Complaint; Review MLS and NMPASI files)

                    **Total**                                37.35 hours[1]

**Post-Filing Litigation**

**1.    Initial stage through Case Management Conference**
(Attempts to resolve the litigation; Filing Pre-discovery Disclosures
and Case Management Statement and attend conference)

                    **Total**                                4.2  hours[2]

**2.    Second stage**
    a.    Trying to find the "proper" treatment facility for Parks

                    **Total Hours Worked**                   18.87 hours[3]
                    **Requested Hours**                      16.87 hours[4]

    b.    Working with client and Public Defender's Office as to
          Parks' and self-mutilation after Retaliatory Arrest

                    **Total Hours Worked and Requested**     3.75 hours[5]

    c.    Trying to get Defendants to file correct Initial Disclosures

                    **Total Hours Requested**                3.45 hours[6]

---

[1] David G. Banes: 27.1; Jacob Ouslander: 10.25.

[2] David G. Banes: 4.2.

[3] "No charge" for Sept. 7, Sept. 16, Oct, 06, Oct, 22 and Dec. 8, 2004.

[4] David G. Banes: 3.6; Eric D. Bozman: 13.27.

[5] David G. Banes: 2.55; Eric D. Bozman: .5; Joseph E. Horey: .7.

                                                            **Exhibit  1**

d.    Review DPS discovery materials

       **Total Hours Requested**      8.25 hours[7]

e.    Meetings with client

       **Total Hours Worked**      6.45 hours[8]
       **Requested Hours**      4.85 hours[9]

f.    Research and draft Amended Complaint
(Research re: difference between prison and
jail custody liability; Review recent judicial decisions
on §1983 and ADA; Standards of Negligence).

       **Total**      20.5 hours[10]

g.    General preparation of case and prepare to respond to
Defendants' discovery

       **Total Hours Worked**      12.45 hours[11]
       **Requested Hours**      10.95 hours[12]

h.    Discovery Requests

       **Total Hours Worked**      5.7  hours[13]
       **Requested**      3.8  hours[14]

---

[6] David G. Banes: 3.45.

[7] Auralou Sabangan: 8.25.

[8] "No charge" Dec. 13; Dec. 31, 2004; Jan. 27, 2005.

[9] David G. Banes: 2.75; Eric D. Bozman: 2.1.

[10] David G. Banes: 2.3; Jacob Ouslander: 18.2.

[11] "No charge" for Sept. 16; Sept, 22; Nov. 17; Nov. 24; and Dec. 8, 2004.

[12] Robert J. O'Connor: .55; David G. Banes: 4.2; Eric D. Bozman: 5.9.

[13] "No charge" for Oct. 6; Oct. 11, 2004.

[14] David G. Banes: .6; Eric D. Bozman: 3.2.

i.    Settlement negotiations

**Total Hours Worked**                                6.2 hours[15]


**3.    Post-Filing of Motion**
a.    Attorney fee research

**Total Hours Worked**                                9.7    hours
**Requested Hours**                                5.25 hours[16]

b.    Additional Research and draft Motion For Fees,
Assemble Exhibits, Check Time Sheets,
Draft Declaration

**Total Hours Worked**                                14.85 hours[17]

c.    Review Defendants' Opposition Brief with Exhibits

**Total Hours Worked**                                1.0    hours[18]

d.    Research attorney fees for making motion (fees-on-fees)

**Total Hours Worked**                                4.25 hours[19]

e.    Draft Reply brief; Revise Summary, Assemble
Exhibits, Draft Declaration

**Total Hours Worked**                                12.5 hours[20]


3083-01-050726-APPENDIX-rcr

---

[15] David G. Banes: 1.4; Joseph E. Horey: .3; Eric D. Bozman: 4.5.

[16] Auralou Sabangan: .25; Catherine Chang: 5.25.

[17] David G. Banes: 5.65; Joseph E. Horey: .9; Catherine Chang: 7.8.

[18] David G. Banes

[19] David G. Banes

[20] David G. Banes